**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

NAZIR BORISOV,

      Petitioner,

  v.                                  No. 2:25-cv-01315 JB-GJF

DORA CASTRO, Warden, Otero Processing
Center, et al.,

      Respondents.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION ON PETITION FOR A WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241 (DKT. NO. 1)

THIS MATTER is before the Court on the *Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241* (Dkt. No. 1) ("Petition") and *Notice of Motion and Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction; Memorandum of Points and Authorities* (Dkt. No. 3) ("Preliminary Injunction Motion"), filed by Petitioner Nazir Borisov ("Petitioner" or "Mr. Borisov") on December 30, 2025.[1] Respondents Mary De Anda-Ybarra, Todd M. Lyons, Kristi Noem, and Pamela Jo Bondi (collectively, the "Federal Respondents") filed a *Motion to Dismiss Petition for a Writ of Habeas Corpus* (Dkt. No. 11) ("Motion to Dismiss"). Respondent Dora Castro, Warden of the Otero County Processing Center where Petitioner is being held, is separately represented and notified the Court that "she takes no positions separate from the USA Respondents related to the Petition" and the Preliminary Injunction Motion and that she joins the positions of the Federal Respondents in this matter. Notice, Dkt. No. 14. Petitioner filed a response in opposition to the Federal Respondents' motion to dismiss. Resp., Dkt. No. 15.

---

[1] The undersigned files this Proposed Findings and Recommended Disposition ("PFRD") pursuant to the presiding judge's Order of Reference (Dkt. No. 5).

In accordance with Federal Rule of Civil Procedure 65(a)(2), the undersigned held an evidentiary hearing by Zoom on the Preliminary Injunction Motion and the Motion to Dismiss and considered the merits of the Petition on March 9, 2026. *See* Clerk's Minutes, Dkt. No. 22. Neither party objected to consolidation under Rule 65(a)(2). At the hearing, Petitioner requested an opportunity to submit a supplemental brief, a request this Court granted to both parties. Only Petitioner submitted a timely supplemental brief (Dkt. No. 24). This matter is ready for decision.

Having reviewed the Petition, the Preliminary Injunction Motion, the Motion to Dismiss, the briefs, the evidence, the law, and the arguments of counsel, the Court recommends that the Petition be granted as to Counts One and Two for violation of the Immigration and Nationality Act ("INA") and procedural due process and denied as to Counts Three and Four. The Court also advises ordering an individualized bond hearing to be held within seven days. Consequently, and for the same reasons, the Court recommends denying the Motion to Dismiss as to Counts One and Two and granting it as to Counts Three and Four, but on different grounds than those argued by Respondents. Given this recommendation regarding the merits of the Petition, the Court advises that the Preliminary Injunction Motion should be denied as moot.

## I.     INTRODUCTION

This case is one of hundreds of § 2241 habeas cases brought in this District and one of thousands brought in districts across the nation stemming from a new interpretation of the INA, 8 U.S.C. § 1225(b)(2)(A), by the United States Department of Homeland Security ("DHS"). From 1997 to 2025, through five successive presidential administrations, when United States Immigration and Customs Enforcement ("ICE") detained noncitizens[2] within the interior of the United States who did not have a pending order of removal, it did so under 8 U.S.C. § 1226.

---

[2] The INA defines an "alien" as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). The Court uses "alien" and "noncitizen" interchangeably in this PFRD.

*Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 500 (5th Cir. 2026). On July 8, 2025, however, DHS issued new interim guidance that all noncitizens who enter the country without being admitted or who arrive without proper documentation are subject to *mandatory* detention, regardless of their length of residency in the country, unless they are paroled under INA § 212(d)(5). *See id.*

The Board of Immigration Appeals ("BIA") considered this new policy interpretation in *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA Sept. 5, 2025). The BIA held that the plain language of 8 U.S.C. § 1225(b)(2)(A) deprived immigration judges of authority to hear bond requests or to grant bonds to aliens who are present in the United States without admission. *Id.* at 225. Yajure Hurtado had crossed into the United States without inspection in 2022, lived in the United States for years, was granted temporary protected status in 2024 by the United States Citizenship and Immigration Services ("USCIS"), but was arrested after that status expired. *Id.* at 216-17. The BIA concluded, "Aliens, like respondent, who surreptitiously cross into the United States remain applicants for admission until and unless they are lawfully inspected and admitted by an immigration officer." *Id.* at 228. "Remaining in the United States for a lengthy period of time following entry without inspection, by itself, does not constitute an 'admission.'" *Id.*

The BIA considered significant the history and passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), which substituted the term "admission" for "entry" and replaced deportation and exclusion proceedings with removal proceedings. *Id.* at 222-23. As the BIA explained, Congress enacted the IIRIRA to remedy the unintended consequence of having created a statutory scheme where aliens who enter without inspection could take advantage of greater procedural and substantive rights afforded in deportation proceedings, while aliens who presented themselves at the border were limited to more summary exclusion proceedings. *Id.* at 223 (quoting *Martinez v. Attorney General of U.S.*, 693 F.3d 408, 413 n.5 (3d Cir. 2012)).

Consequently, according to the BIA, aliens who enter without inspection or admission remain "applicants for admission," *id.* at 224, regardless how long they have lived here, until an immigration officer determines that they are "clearly and beyond a doubt entitled to be admitted," *id.* at 228 (quoting 8 U.S.C. § 1225(b)(2)(A)). In the wake of *Yajure Hurtado*, immigration judges have uniformly concluded that they lack jurisdiction to hold bond hearings for detainees held under § 1225(b)(2)(A).[3]

According to the Federal Respondents, Petitioner is properly detained under § 1225(b)(2)(A) because he is an applicant for admission who is seeking admission, and his due process rights are limited to the statutory rights provided in the INA. On the other hand, Petitioner argues that Respondents did not properly revoke his parole and that his detention is unlawful. For the reasons that follow, the Court recommends concluding that § 1225(b)(2)(A) does not apply to Petitioner, and that Respondents violated the INA and the Due Process Clause when subjecting him to mandatory detention without a bond hearing, as required by § 1226.

## II.     FACTUAL BACKGROUND

Nazir Borisov is 29 years old and a citizen of Russia. *See* Ex. A, Dkt. No. 1-1. He arrived with his wife in the United States as an "arriving alien" at the San Ysidro, California, port of entry on February 16, 2023, without valid documentation necessary for admissibility. *See* Ex. D, Dkt. No. 1-4.[4] The same day, he was issued a Form I-94 and released on his own recognizance. *See* Gov.'s Ex. 1 at 3, Dkt. No. 11-1; Ex. B, Dkt. No. 1-2; Supp. Br, Ex. A, Dkt. No. 24-1.

---

[3] *Yajure Hurtado* is called a "precedential" opinion, which in this context means a decision identified by the BIA as binding authority on U.S. immigration courts. The Supreme Court recently directed district courts to "exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 394 (2024). Courts "may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* at 413. Consequently, while binding on immigration courts, *Yajure Hurtado* is not binding on this Court.

[4] The parties dispute whether Petitioner arrived at the port of entry or crossed the border at a time and place other than as designated by the Secretary. *Compare* Ex. D, Dkt. No. 1-4, *with* Gov.'s Ex. 1 at 2, Dkt. No. 11-1. The Notice to

The Form I-94 is a U.S. Customs and Border Protection ("USCBP") Arrival/Departure Record, issued at the border and created electronically upon arrival, used to show a noncitizen's legal-visitor status. *See* Supp. Br., Ex. C, Dkt. No. 24-3; Ex. B, Dkt. No. 1-2. The I-94 printed from the USCBP website functions as a "record of admission" of lawful admission or parole. *See* Gov.'s Ex. 2, Dkt. No. 11-2. *See also* 8 C.F.R. § 1.4 ("The term Form I–94, as used in this chapter I, includes the collection of arrival/departure and admission or parole information by DHS, whether in paper or electronic format, which is made available to the person about whom the information has been collected, as may be prescribed by DHS.").

Petitioner's Form I-94 lists "DT" as the "Class of Admission." *See* Ex. B, Dkt. No. 1-2. The "DT" code on the Form I-94 signifies that the alien has been paroled at the port of entry, and the code was created to justify the reason for parole in specific cases. *See* Supp. Br., Ex. D, Dkt. No. 24-4. "DT" Port of Entry Parole is the USCBP classification for an alien for whom an emergent need exists under § 212(d)(5) and who does not present a security risk or a risk of absconding. *See* Supp. Br., Ex. A at 1, Dkt. No. 24-1.

The Form I-94 also has an "Admit Until Date," which is generally the date on (or before) which the noncitizen must exit the United States. *See* Supp. Br., Ex. E, Dkt. No. 24-5 at 1; Ex. B, Dkt. No. 1-2. According to Petitioner's Form I-94, the "Admit Until Date" was February 15, 2024. Ex. B, Dkt. No. 1-2.

On February 27, 2023, Petitioner filed an affirmative application of asylum with the U.S. Citizenship and Immigration Services ("USCIS") via Form I-589 Application for Asylum and for

---

Appear states that he was an arriving alien who applied for admission at the San Ysidro, CA port of entry on February 16, 2023. Ex. D at 1, Dkt. No. 1-4. The box "You are an alien present in the United States who has not been admitted or paroled" was unmarked. *Id.* Even assuming Petitioner bears the burden to prove this fact, the Court notes that DHS's own charging document, which initiates the removal proceedings, asserts he applied for admission as an arriving alien. For these reasons, the Court recommends finding that Petitioner arrived at the port of entry.

Withholding of Removal. *See* Ex. C, Dkt. No. 1-3. The USCIS notified him that it received his application and that he "may remain in the U.S. until [his] asylum application is decided." *Id.*

Since his release, Petitioner has been living and working as a truck driver in the United States. *See* Preliminary Injunction Mot. 4, Dkt. No. 3; Ex. B, Dkt. No. 1-2. His son was born in New York on June 26, 2024. Preliminary Injunction Mot. 4, Dkt. No. 3. Petitioner attended all check-in appointments with the DHS in New York. *Id.*

Petitioner received a Notice to Appear on or about December 19, 2024. Gov.'s Ex. 3 at 2, Dkt. No. 11-3. The Notice ordered Petitioner to appear before an immigration judge on December 4, 2025, to show cause why he should not be removed from the United States as an "arriving alien" under Section 212(a)(7)(A)(i)(I) of the INA, who at the time of his application for admission at the port of entry was a non-citizen who did not possess valid entry documents. *See id.* at 1. On November 5, 2025, however, the Executive Office for Immigration Review ("EOIR") issued a Notice of Cancellation of Immigration Hearing, canceling the December 4, 2025 hearing. *See* Gov.'s Ex. 4, Dkt. No. 11-4.

At a DHS check-in on December 4, 2025, immigration officials detained Petitioner pursuant to a Form I-200 Warrant of Arrest of Alien issued by an authorized immigration officer. *See* Gov.'s Ex. 5, Dkt. No. 11-5. According to the Form I-213 prepared by DHS that same day, Petitioner was "re-detained now that bedspace is available." Gov.'s Ex. 1 at 3, Dkt. No. 11-1. That same form stated that he had been "released on his own recognizance due to humanitarian reasons and a lack of detention space." *Id.* Petitioner was transferred to the Otero County Processing Center in New Mexico. Petition ¶ 6, Dkt. No. 1; Gov.'s Ex. 6, Dkt. No. 11-6.

On January 14, 2026, Petitioner filed a defensive asylum application with the immigration court, and the next day, an immigration judge sustained the charge of removal. *See* Respondents'

Mot. 3, Dkt. No. 11. Petitioner had a master calendar hearing on February 5, 2026. *Id.* A hearing on his defensive asylum application was set for March 16, 2026. *See* Hr'g Recording, ABQ-GILa_20260309_134521 (Mar. 9, 2026) at 2:21-2:26 p.m. Petitioner's affirmative asylum application is still pending in parallel before USCIS. *See id.*

### III.  PROCEDURAL HISTORY

Petitioner filed this habeas action on December 30, 2025, principally complaining of his re-detention after parole without being afforded a bond hearing. Petition, ¶¶ 38-113, Dkt. No. 1. Petitioner brings four claims for relief: (1) violation of the Due Process Clause; (2) violation of the INA and applicable regulations based on his detention; (3) violation of the INA and applicable regulations based on the revocation of his parole; and (4) violation of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(A). *Id.* at ¶¶ 91-113.

Petitioner requests eight forms of relief: (1) assume jurisdiction over the case; (2) issue an order to show cause requiring Respondents to respond to the writ within three days and to set a hearing within five days thereafter; (3) issue a Writ of Habeas Corpus granting his immediate release, or alternatively, require an immigration judge to hold a bond hearing where the Government bears the burden to justify his continued detention; (4) declare that his arrest and detention are unlawful under the Fifth Amendment's Due Process Clause, the Fourth Amendment, the APA, and the INA; (5) enjoin Respondents from moving Petitioner from the District or deporting him during the pendency of the Petition; (6) enjoin Respondents from re-detaining him unless re-detention is ordered at a hearing before a neutral arbiter in which the government bears the burden by clear and convincing evidence of showing that he is a flight risk or danger to the community; (7) set aside Respondents' unlawful practice under the APA; and (8) award reasonable

attorney's fees and costs under the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504 and 28 U.S.C. § 2412. Petition 24-25, ¶¶ 1-8, Dkt. No. 1.

Also on December 30, 2025, Petitioner filed a motion for temporary restraining order and preliminary injunction (Dkt. No. 3). Petitioner seeks a temporary restraining order (1) requiring Respondents to release him immediately from custody and not re-detain him unless re-detention is ordered at a hearing before a neutral arbiter in which the Government proves by clear and convincing evidence that Petitioner is a flight risk or danger to the community, or (2) requiring Respondents to release him unless he is afforded a bond hearing before a neutral arbiter under 8 U.S.C. § 1226(a) within seven days of the order. Preliminary Injunction Mot. 3, Dkt. No. 3. According to Petitioner, he is likely to succeed on the merits of his claims that his detention and premature revocation of his parole, without an individualized pre-deprivation hearing, violated due process by depriving him of his constitutional liberty interest that accrued during his 33 months in the U.S. *Id.* at 8-12. He contends he and his family will suffer irreparable harm due to the disruption to their family life, and that the balance of equities and public interest favors release or a bond hearing because he is neither a danger nor flight risk. *See id.* at 12-14.

The Federal Respondents subsequently filed a *Motion to Dismiss Petition for a Writ of Habeas Corpus* (Dkt. No. 11), seeking dismissal of both the Petition and the Preliminary Injunction Motion. Respondents raise four primary arguments: (1) the Court lacks subject matter jurisdiction; (2) there is no due process violation; (3) the Court lacks jurisdiction to review the APA claim; and (4) Petitioner failed to exhaust his administrative remedies. *Id.* at 1. Respondent Castro notified the Court that she joins in the positions of the Federal Respondents. Notice, Dkt. No. 18. Given this alignment, the Court will refer to the respondents collectively as "Respondents" throughout this PFRD.

Petitioner replied, largely reiterating his prior arguments in support of his Petition, as well as contending the Court has jurisdiction to issue relief and that exhaustion would be futile. *See* Resp., Dkt. No. 15. After oral argument, he submitted a supplemental brief with additional exhibits in support of his Petition. Supp. Br., Dkt. No. 24.

## IV. LEGAL OVERVIEW

An immigration judge conducts proceedings to decide the inadmissibility or deportability of an alien. 8 U.S.C. § 1229a(1). Aliens placed in removal proceedings may be charged with an applicable ground of inadmissibility under § 1182(a) or of deportability under § 1227(a). Inadmissible aliens are "ineligible to be admitted to the United States." 8 U.S.C. § 1182(a). "[A]ny immigrant at the time of application for admission" who does not possess "a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 1181(a) of this title" is "inadmissible." *Id.* § 1182(a)(7)(A)(i)(I).

Proceedings under § 1229a, unless otherwise specified, "shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States." *Id.* § 1229a(a)(3). In removal proceedings, written notice called a "notice to appear" must be given to the alien either personally or served through the mail. *Id.* § 1229(a)(1). The notice to appear includes, among other things, the nature of the proceedings and legal authority for them, the alleged violation of law, and the charges. *Id.*

The statutory provisions at issue in this case are those governing mandatory detention in 8 U.S.C. § 1225, and the "Apprehension and detention of aliens" in 8 U.S.C. § 1226. After discussing

these INA provisions and implementing regulations, the Court will summarize due process law in the immigration context before analyzing how the law applies to Petitioner's detention.

### A.  Overview of Sections 1225 and 1226

"Congress has authorized immigration officials to detain some classes of aliens during the course of certain immigration proceedings" to give "immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity before a final decision can be made." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). Sections 1225 and 1226 govern the detention of noncitizens prior to a final order of removal. *See id.* at 287-89. "In sum, U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2)" and "to detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c)." *Id.* at 289.

Generally, a non-citizen "present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission." 8 U.S.C. § 1225(a)(1). The implementing regulations define an "arriving alien" as "an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry , or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport." 8 C.F.R. § 1001.1(q). "An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked." *Id.* An alien who is caught trying to enter at a place other than a

port of entry is treated as an arriving alien. *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103, 108 (2020) (citing 8 U.S.C. §§ 1225(a)(1), (3)). All aliens "who are applicants for admission *or otherwise seeking admission* or readmission to or transit through the United States shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3) (emphasis added). "Admission" or "admitted" means "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).

Section 1225(a) also provides for the "Withdrawal of application for admission": "An alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States." 8 U.S.C. § 1225(a)(4). "An applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant *in seeking admission to the United States*, including the applicant's intended length of stay and whether the applicant intends to remain permanently or become a United States citizen, and whether the applicant is inadmissible." *Id.* § 1225(a)(5) (emphasis added).

Section 1225(b)(1) sets forth the procedures for the "Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled." 8 U.S.C. § 1225(b)(1). An immigration officer may order expedited removal of an arriving alien without further hearing or review if the officer determines that the alien is inadmissible under § 1182(a)(6)(C) or 1182(a)(7), provisions governing inadmissibility due to fraud, misrepresentation, or lack of valid documentation. 8 U.S.C. § 1225(b)(1)(A)(i); *Jennings*, 583 U.S. at 287 (citing 8 U.S.C. § 1225(b)(1)(A)(i) (in turn citing §§ 1182(a)(6)(C), (a)(7))). Aliens also subject to expedited removal are those designated by the Attorney General in his discretion. *Id.* (citing 8 U.S.C. § 1225(b)(1)(A)(iii)).

"Applicants can avoid expedited removal by claiming asylum." *Thuraissigiam*, 591 U.S. at 109. "If an applicant 'indicates either an intention to apply for asylum' or 'a fear of persecution,' the immigration officer 'shall refer the alien for an interview by an asylum officer.'" *Id.* (quoting §§ 1225(b)(1)(A)(i)-(ii)). "If the asylum officer finds an applicant's asserted fear to be credible, the applicant will receive 'full consideration' of his asylum claim in a standard removal hearing." *Id.* at 110 (citing 8 C.F.R. § 208.30(f)) (internal footnote omitted). Asylum applicants are nevertheless "detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." *Id.* at 111 (quoting § 1225(b)(1)(B)(iii)(IV)). If an alien is found to have a credible fear, he may be detained pending further consideration of the asylum application. *Id. See also* 8 U.S.C. § 1225(b)(1)(B)(ii) ("If the [asylum] officer determines at the time of the interview that an alien has a credible fear of persecution …, the alien shall be detained for further consideration of the application for asylum.").

Section 1225(b)(2) governs "Inspection of other aliens." 8 U.S.C. § 1225(b)(2). "Section 1225(b)(2) is broader" than § 1225(b)(1) and "serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1) (with specific exceptions not relevant here)." *Jennings*, 583 U.S. at 287. Under § 1225(b)(2), "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien **seeking admission** is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a [removal] proceeding…." 8 U.S.C. § 1225(b)(2)(A) (bold added); *Jennings*, 583 U.S. at 288. Detention under § 1225(b) is mandatory until immigration officers decide either the application for asylum or until removal proceedings conclude. *Jennings*, 583 U.S. at 299-300.

The Secretary of Homeland Security may "in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent

humanitarian reasons or significant public benefit any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). Granting such parole, however, "shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.* Except for temporary parole under 8 U.S.C. § 1182(d)(5)(A) for urgent humanitarian reasons or significant public benefit, "there are no *other* circumstances under which aliens detained under § 1225(b) may be released." *Id.* at 300. Under § 1182(d)(5)(A), arriving "aliens who claim asylum and establish a credible fear with an asylum pre-screening officer can be paroled at the point of entry while they pursue their asylum application." *Succar v. Ashcroft*, 394 F.3d 8, 15 (1st Cir. 2005).

Section 1226(a) establishes the process of arresting and detaining noncitizens "already present in the United States." *Jennings*, 583 U.S. at 303. As the Supreme Court explained, "Section 1226(a) creates a default rule for those aliens by permitting—but not requiring—the Attorney General to issue warrants for their arrest and detention pending removal proceedings." *Id.* Section 1226(a) provides: "On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). As a matter of federal regulation, noncitizens detained under § 1226(a) generally "receive bond hearings at the outset of detention." *Jennings*, 583 U.S. at 306 (citing 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1)).

According to the federal regulations pertaining to "Apprehension, custody, and detention," at the time of issuance of the notice to appear, or anytime afterwards and until removal proceedings

are concluded, the noncitizen "may be arrested and taken into custody under the authority of Form I–200, Warrant of Arrest." 8 C.F.R. § 236.1(b)(1). Section 236.1(d)(1) provides:

> After an initial custody determination by the district director, including the setting of a bond, the respondent may, at any time before an order under 8 CFR part 1240 becomes final, request amelioration of the conditions under which he or she may be released. Prior to such final order, … the immigration judge is authorized to exercise the authority in section 236 of the Act … to detain the alien in custody, release the alien, and determine the amount of bond, if any, under which the respondent may be released….

8 C.F.R. § 236.1(d)(1).

The Attorney General "may release the alien" on bond or conditional parole, unless the alien has committed certain criminal offenses or terrorist activities listed in § 1226(c), in which case detention is mandatory. *See* 8 U.S.C. § 1226(a)(2)(A)–(B), (c); *Jennings*, 583 U.S. at 288-89, 303. "The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien." 8 U.S.C. § 1226(b). In 2025, Congress passed the Laken Riley Act, which added additional criminal convictions triggering § 1226(c)'s custodial provisions. *See* Pub. L. No. 119-1, § 2, 139 Stat. 3 (2025) (codified as amended at § 1226(c)(1)(E)).[5] The Amendment mandated custody for aliens inadmissible under paragraph (6)(A), (6)(C), or (7) of section 1182(a) who are charged, arrested, or convicted of burglary, theft, larceny, shoplifting, assault of a law enforcement officer, or any crime resulting in death or serious bodily injury to another person. 8 U.S.C. § 1226(E)(i)-(ii).

### B. Overview of Due Process in the Immigration Context

The Fifth Amendment's Due Process Clause prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. V. The core concept of due process is protection of the individual against arbitrary government

---

[5] Section 1226(c) does not apply here because it is undisputed Petitioner has no criminal history.

action. *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998). Due process comes in two varieties. Substantive due process prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the idea of ordered liberty. *Id.* at 847. Procedural due process, by contrast, requires notice and an opportunity to be heard appropriate to the nature of the case before depriving an individual of life, liberty, or property interest. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Immigration proceedings are civil in nature, and as such, the Government's interests are non-punitive, such as ensuring the appearance of an alien at future immigration proceedings and protecting the community from danger. *Id.*

The Constitution gives the political branches "plenary authority to decide which aliens to admit" and the "power to set the procedures to be followed in determining whether an alien should be admitted." *Thuraissigiam*, 591 U.S. at 139. An alien seeking initial entry to the United States is only entitled to the process authorized by Congress. *Id.* at 138-39. "While aliens who have established connections in this country have due process rights in deportation proceedings, the Court long ago held that Congress is entitled to set the conditions for an alien's lawful entry into this country and that, as a result, an alien at the threshold of initial entry cannot claim any greater rights under the Due Process Clause." *Id.* at 107 (holding that alien detained near border shortly after unlawful entry did not "effect an entry" and only has those rights regarding admission that Congress provided by statute). "When an alien arrives at a port of entry—for example, an international airport—the alien is on U.S. soil, but the alien is not considered to have entered the country for the purposes of this rule." *Thuraissigiam*, 591 U.S. at 139. Aliens detained shortly after

unlawful entry likewise did not effect an entry and remain "on the threshold." *Id.* at 140 (explaining that alien who succeeded in making it 25 yards into U.S. territory before he was caught did not effect an entry and had only those rights regarding admission that Congress provided by statute). Moreover, the "detention of an alien in custody pending determination of his admissibility does not legally constitute an entry though the alien is physically within the United States." *Leng May Ma v. Barber*, 357 U.S. 185, 188 (1958). "But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693.

## V. ANALYSIS

### 1. The Court has jurisdiction over the Petition.

A court is authorized to issue a writ of habeas corpus when a person is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). "Challenges to immigration detention are properly brought directly through habeas." *Soberanes v. Comfort*, 388 F.3d 1305, 1310 (10th Cir. 2004) (citing *Zadvydas v. Davis*, 533 U.S. 678, 687-88 (2001)). Respondents nonetheless assert that three provisions bar district court review of Petitioner's claims in this habeas case: 8 U.S.C. § 1252(e)(3), 8 U.S.C. § 1252(g), and 8 U.S.C. § 1252(b)(9). Petitioner disagrees, as does this Court.

"[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Demore v. Kim*, 538 U.S. 510, 517 (2003) (quoting *Webster v. Doe*, 486 U.S. 592, 603 (1988)). And Congress must be "particularly clear" that it intends for a provision to bar habeas review. *Id.*

According to Respondents, § 1252(e)(3) restricts judicial review of determinations under § 1225(b) to the District Court for the District of Columbia:

> Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of—
>
> > (i)  whether such section, or any regulation issued to implement such section, is constitutional; or
> >
> > (ii)  whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

8 U.S.C. § 1252(e)(3)(A).

Respondents argue that the judicial limitation applies in this case because Petitioner is in essence challenging DHS's determination that aliens who enter without inspection are subject to mandatory detention under § 1225(b)(2), and thus, is seeking judicial review of a written policy or guideline implementing § 1225(b). Petitioner counters that § 1252(e)(3) only governs systemic challenges to the legality or constitutionality of § 1225, not to an as-applied challenge to his misclassification as being subject to § 1225(b) rather than § 1226.

Here, Petitioner is not challenging whether § 1225(b)(2)(A) is constitutional or whether a particular regulation or policy is lawful. Section 1252(e)(3) is subtitled "Challenges on validity of the system." 8 U.S.C. § 1252(e)(3). Section 1252(e)(3) does not strip Petitioner's right to challenge his detention under the specific facts of his case. *See, e.g.*, *Castro v. Noem*, Case No. 1:25-cv-01129-KWR-LF, 2026 WL 280470, at *2 (D.N.M. Feb. 3, 2026) (Riggs, J.) ("Respondents cite to § 1252(e)(3). But Petitioner does not challenge the legality or constitutionality of any regulation implementing removal procedures."); *Rodriguez-Novoa v. Lyons*, No. 1:25-cv-01073-SMD-GBW, Temporary Restraining Order 3-4 (D.N.M. Dec. 23, 2025) (Davenport, J.) (rejecting argument that

§ 1252(e)(3) strips jurisdiction to consider habeas challenge to government's authority to detain him under § 1225(b), as it is not challenge to validity of statutory scheme itself).

Next, Respondents argue that Section 1252(g) bars jurisdiction to review Petitioner's claims altogether. Section 1252(g) provides:

> [N]o court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General *to commence proceedings*, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g) (italics added). Respondents assert that, because detention arises from the decision to commence removal proceedings against an alien, § 1252(g) bars judicial review of Petitioner's claims. Petitioner replies that § 1252(g) is much narrower than Respondents assert, and that challenging *detention* is an action separate from commencing proceedings, adjudicating cases, or executing removal orders.

Indeed, the Supreme Court has instructed that § 1252(g) applies only to three specific actions – the decision or action to commence proceedings, adjudicate cases, or execute removal orders. *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 482 (1999). As Petitioner points out, he is not asking the Court to second-guess Respondents' discretionary decision to commence removal proceedings against him. Rather, he is challenging a separate matter – whether he is subject to mandatory detention under § 1225 or discretionary detention under § 1226. Notably, the facts in this case demonstrate that the decision to detain Petitioner, which occurred on or around December 4, 2025, did not occur at the same time Respondents initiated removal proceedings against him. The Notice to Appear was signed nearly a year prior, on December 18, 2024. *See* Gov.'s Ex. 3 at 1, Dkt. No. 11-3. Detention was thus a separate action from the commencement of removal proceedings. Consequently, § 1252(g) does not strip the Court of jurisdiction to consider the claims in the Petition. *See Jennings*, 583 U.S. at 294 (construing §

1252(g) as limited to just the three actions themselves – commencing proceedings, adjudicating cases, or executing removal actions – and not sweeping in any claim that could technically arise from the listed actions); *Labrada-Hechavarria v. U.S. Attorney General*, No. 23-13664, No. 24-10645, 2026 WL 496486, at *2 (11th Cir. Feb. 23, 2026) ("Although 8 U.S.C. § 1252(g) is a jurisdiction-stripping provision, we continue to have jurisdiction to address the main legal question presented here—whether the petitioners were detained pursuant to § 1225(a) or § 1226(a)."); *Aguilar v. Bondi*, Case No. 1:25-cv-00996-KWR-KK, 2026 WL 84520, at *3 n.2 (D.N.M. Jan. 12, 2026) (Riggs, J.) (explaining that § 1252(g) does not bar habeas action in which petitioner asks legal question separate from decision to commence removal proceedings against him, to wit, whether he is subject to mandatory detention under § 1225(b)(2)(A) or discretionary detention under § 1226(a)).

Finally, Respondents argue that § 1252(b)(9) divests this Court of jurisdiction to review the Petition. Section 1252(b)(9) states:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of Title 28 or any other habeas corpus provision … to review such an order or such questions of law or fact.

8 U.S.C. § 1252(b)(9). Section 1252(a)(5) provides that a petition for review filed with the court of appeals is the "sole and exclusive means for judicial review of an order of removal…" 8 U.S.C. § 1252(a)(5).

According to Respondents, § 1252(a)(5) and § 1252(b)(9), when read together, channel review of all claims related to a removal proceeding, including challenges to the decision to detain

an alien, to the appropriate court of appeals. As Petitioner again argues, he is not challenging a legal issue arising from the initiation of removal proceedings or of a final order of removal.

The Court agrees that § 1252(b)(9) does not strip this Court of jurisdiction to consider the Petition. The Petition challenges only whether Petitioner is entitled to a bond hearing under § 1226 or is instead subject to mandatory detention under § 1225(b)(2)(A). That legal question does not arise from the action taken or proceeding brought to remove him, and thus, § 1252(b)(9) does not bar this Court's consideration of the Petition. *Cf. Jennings*, 583 U.S. at 293-95 (concluding that § 1252(b)(9) does not present jurisdictional bar to Court's consideration of whether certain statutory provisions require detention without bond hearing); *Mukantagara v. U.S. Dep't of Homeland Security*, 67 F.4th 1113, 1116 (10th Cir. 2023) (holding that § 1252(b)(9) did not bar judicial review of USCIS decision to terminate plaintiffs' refugee status because it is not a decision to commence proceedings, much less adjudicate a case or execute a removal order); *Ochieng v. Mukasey*, 520 F.3d 1110, 1115 (10th Cir. 2008) (explaining that alien may challenge detention under § 1226(c) through a § 2241 habeas corpus proceeding and that 8 U.S.C. §§ 1252(a)(5) and 1252(b)(9) do not apply where alien is not seeking review of an order of removal, but review of his detention). To hold otherwise, and to expansively interpret "arising from," would effectively deprive the detainee of any meaningful chance for judicial review if he had to wait for the final order of removal. *Cf. Jennings*, 583 U.S. at 293 ("Interpreting 'arising from' in this extreme way would also make claims of prolonged detention effectively unreviewable. By the time a final order of removal was eventually entered, the allegedly excessive detention would have already taken place.").[6]

---

[6] Respondents argue that *Jennings* specifically noted that the parties "are not challenging the decision to detain them in the first place or to seek removal." *Jennings*, 583 U.S. at 294. While *Jennings* did not conclusively decide the issue here, its reasoning applies equally to the legal question of whether Petitioner is entitled to a bond hearing.

For the foregoing reasons, the Court recommends assuming jurisdiction to consider the merits of the instant Petition.

### 2. The Court should not deny the Petition for failure to exhaust administrative remedies.

The INA mandates exhaustion as to final orders of removal, but it contains no exhaustion provision regarding challenges to preliminary custody or bond determinations. *Gonzalez v. O'Connell*, 355 F.3d 1010, 1016 (7th Cir. 2004). Although § 2241 does not expressly require a petitioner to exhaust direct appeals before filing a petition for habeas corpus, as a prudential matter, habeas petitioners must exhaust available administrative remedies before seeking habeas relief under § 2241. *Garza v. Davis*, 596 F.3d 1198, 1203 (10th Cir. 2010); *Castro-Cortez v. I.N.S.*, 239 F.3d 1037, 1047 (9th Cir. 2001), *overruled on other grounds by Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006). Where exhaustion is not statutorily required, "sound judicial discretion governs." *Gonzalez*, 355 F.3d at 1016 (quoting *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992)). "A narrow exception to the exhaustion requirement applies if a petitioner can demonstrate that exhaustion is futile." *Garza*, 596 F.3d at 1203.

It is undisputed that Petitioner did not ask for a bond hearing since his detention. Petitioner nevertheless argues that administrative exhaustion is not required in this case based on futility, whereas Respondents contend that he is not excused from doing so.

The BIA's *Yajure Hurtado* decision is binding on immigration courts and appears to categorically deny relief to noncitizens like Petitioner who DHS now considers to be subject to mandatory detention under § 1225(b). Petitioner thus has shown that, if he asserted his right to a bond hearing in his immigration case, the immigration judge, being bound by *Yajure Hurtado*, would deny his request for release for lack of jurisdiction to grant bond. Consequently, the Court recommends finding that the futility exception to exhaustion applies and this Court may consider

the habeas petition. *Cf. Pu Sacvin v. De Anda-Ybarra*, No. 2:25-cv-010131-KG-JFR, 2025 WL 3187432, at \*4 (D.N.M. Nov. 14, 2025) ("Under *Hurtado*, Immigration Judges ("IJs") lack jurisdiction to provide § 1226(a) bond hearings to individuals in Mr. Pu Sacvin's position, rendering any attempt to seek relief directly from the agency futile."); *Mateo Francisco v. Dedos*, No. 1:25-cv-1229 MIS-GJF, 2026 WL 145456, at \*8 (D.N.M. Jan. 20, 2026) (explaining that, where petitioner has shown that, had he asserted right to bond hearing, immigration judge, being bound by *Yajure Hurtado*, would deny his request for release for lack of jurisdiction to grant bond, futility exception to exhaustion applies and court may consider habeas petition), *PFRD adopted by* 2026 WL 300319 (D.N.M. Feb. 4, 2026).

### 3. Petitioner's detention for months without bond hearing violates INA and procedural due process.

Petitioner asserts that he is not "seeking admission," where he was already paroled into the country and has been living in the United States for more than two years. For their part, Respondents assert that the Court should dismiss the Petition because Petitioner's detention is lawful under § 1225(b)(2)(A), as he has not been admitted and remains an applicant for admission subject to mandatory detention. According to Respondents, § 1225 applies in the interior of the country and is not limited to aliens detained at the border.

This Court parts ways with Respondents' analysis and instead concludes from the text and structure of § 1225 that "seeking admission" has a meaning independent of "applicant for admission" and that § 1225 detention is limited to detentions at the border. The text of § 1225(b)(2)(A) makes clear that it applies to (1) "an applicant for admission", (2) who is "seeking admission," and (3) "is not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). The provision therefore limits mandatory detention only to those applicants for admission who are also seeking admission. *See Castanon-Nava v. U.S. Dept. of Homeland*

*Security*, 161 F.4th 1048, 1061 (7th Cir. 2025) ("And while a noncitizen arrested in the Midwest might qualify as 'an alien present in the United States who had not been admitted,' § 1225(a)(1), the mandatory detention provision upon which Defendants rely[] limits its scope to an 'applicant for admission' who is 'seeking admission,' § 1225(b)(2)(A)."); *Singh v. Noem*, No. CIV 25-1110 JB/KK, 2026 WL 146005, at *20-21 (D.N.M. Jan. 20, 2026) (explaining that "seeking admission" has separate meaning and narrows broader universe of "applicants for admission"). To construe "applicant for admission" to be the same as an alien "seeking admission" would render the latter phrase surplusage. *See Castanon-Nava*, 161 F.4th at 1061. Had Congress intended all applicants for admission to be detained, it could have drafted § 1225(b)(2)(A) far more simply: "Subject to subparagraphs (B) and (C), if the examining immigration officer determines that an applicant for admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained…." Instead, Congress limited detention to those applicants for admission who are not clearly and beyond a doubt entitled to be admitted *and* who are "seeking admission." 8 U.S.C. § 1225(b)(2)(A).

Furthermore, the statute's use of the present participle "seeking" demonstrates the need for the noncitizen to be taking some action *at present* in attempting to gain admission. This interpretation also accords with § 1225(a)(3), which suggests the terms are not coterminous: "All aliens (including alien crewmen) who are applicants for admission *or otherwise seeking admission* or readmission to or transit through the United States shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3) (emphasis added). If the terms had the same meaning, it would be redundant to use "seeking admission" in § 1225(a)(3).

The Court is well aware that two circuits, in 2-1 decisions, have concluded the opposite. The Eighth Circuit recently agreed with the Fifth Circuit's reasoning in *Buenrostro-Mendez* that

the phrase "applicant for admission" and "seeking admission" mean the same. *Avila v. Bondi*, __ F.4th __, 2026 WL 819258, at *3 (Mar. 25, 2026) (quoting with approval *Buenrostro-Mendez*, 166 F.4th at 502). Both circuits held that an alien who entered the United States many years ago without inspection and lacking legal documents authorizing his admission may be detained without bond under § 1225(b)(2)(A). *Id.* at *1, 6; *Buenrostro-Mendez*, 166 F.4th at 498-500. Neither *Avila* nor *Buenrostro-Mendez* is binding on this Court, however, and this Court declines to follow their reasoning.

Having determined that "seeking admission" has its own separate meaning, the Court must discern what that meaning is. Guided by the statutory definition of "admission," the Court concludes that "seeking admission" is seeking "lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13). While the term "lawful" is not separately defined in the INA, *see* 8 U.S.C. § 1101, the term lawful entry refers to the process in which an alien is inspected and granted entry into the United States by an immigration officer. *See Hing Sum v. Holder*, 602 F.3d 1092, 1096 (9th Cir. 2010) (explaining that "admission" under § 1101(a)(13)(A) "refers to a procedurally regular admission and not a substantively lawful admission"); *Singh*, 2026 WL 146005, at *35 ("Admission requires at minimum 'procedural regularity' with entry procedures.") (quoting *Matter of Quilantan*, 25 I. & N. Dec. 285, 290 (BIA 2010)). The Supreme Court has confirmed that seeking admission is an affirmative act limited geographically to acts taken to enter the United States during the inspection process at the border. *See Jennings*, 583 U.S. at 289 ("U.S. immigration law authorizes the Government to detain certain aliens seeking admission *into the country* under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens *already in the country* pending the outcome of removal proceedings under §§ 1226(a) and (c).") (Emphasis added).

The structure and title of § 1225 also support this interpretation. The title of a statutory section can be a tool "'for the resolution of a doubt' about the meaning of a statute." *Dubin v. United States*, 599 U.S. 110, 121 (2023) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998)). Section 1225 is titled, "*Inspection* by immigration officers; expedited removal of inadmissible *arriving* aliens; referral for hearing." 8 U.S.C. § 1225 (emphasis added). Those terms suggest that § 1225 applies during inspection at the border. The text of § 1225 reinforces that its scope is focused on the inspection process. *See, e.g.*, 8 U.S.C. § 1225(a)(3). "By anchoring § 1225 in inspection concepts that Congress defines, it signals that an inspection at the threshold of entry triggers the powers and procedures that follow." *Singh*, 2026 WL 146005, at *14. The implementing regulations likewise tie such inspections to the border. *See* 8 C.F.R. § 235.1(a) ("Application to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry when the port is open for inspection, or as otherwise designated in this section."). Consequently, the text and structure of § 1225 suggest that an alien "seeking admission" is one who does so at the border.

The legislative history accords with this construction. Before passage of the IIRIRA, 8 U.S.C. § 1252(a)(1) provided that noncitizens arrested in the United States pending a determination of deportability could be released on bond. *See* 8 U.S.C. § 1252(a)(1) (1996). After passage of the IIRIRA, § 1226(a) now governs the apprehension and detention of aliens on a warrant. 8 U.S.C. § 1226(a). When Congress passed the IIRIRA, it noted that the new § 1226(a) "restates the current provisions in section 242(a)(1) regarding the authority of the Attorney General to arrest, detain, and release on bond an alien who is not lawfully in the United States." H.R. Rep. 104-469(I), at 229 (Mar. 4, 1996). The Executive Office for Immigration Review drafted regulations in 1997 similarly explaining that noncitizens present in the country without having

been admitted or paroled, despite remaining applicants for admission, were nonetheless eligible for bond and bond redetermination under § 1226. *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997) ("Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination."). Given the longstanding practice of detaining noncitizens living in the United States on an arrest warrant and with the chance for bond, the legislative history suggests that Congress did not intend to alter this practice with the IIRIRA. Moreover, the fact that for decades the Executive Branch also did not interpret the IIRIRA in the manner urged by Respondents here or to use its purported mandatory detention authority signifies that "seeking admission" meant seeking lawful entry at the border. *Cf. Bankamerica Corp. v. United States*, 462 U.S. 122, 130-32 (1983) (explaining that, although authority granted by Congress cannot evaporate through lack of administrative exercise, the Government's failure for over 60 years to exercise the power it now claims under the statute strongly suggests that the statute should not be interpreted as granting such power).

Further supporting this interpretation is the following statutory history, as set forth by the Fifth Circuit in *Buenrostro-Mendez*:

> When Congress passed IIRIRA, it estimated that the detention mandate in § 1226(c) would require the detention of 45,000 new immigrants. See H.R. Rep. No. 104-469, pt. 1 at 118, 120, 123 (1996). Supposedly because Congress was worried about insufficient detention capacity, it included a provision that permitted delaying implementation of § 1226(c) for two years. IIRIRA § 303(b), 110 Stat. 3009-586 to 3009-587. IIRIRA did not include a similar provision for § 1225(b)(2)(A), even though, under the government's interpretation, § 1225(b)(2)(A) would require the detention of far more than 45,000 aliens. *See* H.R. Rep. No. 104-469, pt. 1, at 111 (estimating that about two million aliens who had entered without inspection were present in the United States around IIRIRA's enactment in 1996).

166 F.4th at 507. Although the majority in *Buenrostro-Mendez* declined to speculate on Congress's reasons for the deferred implementation of § 1226(c) but not of § 1225(b)(2)(A), that difference is compelling evidence that Congress did not view the IIRIRA as mandating the detention under § 1225(b)(2)(A) of the estimated two million aliens present in the United States who had not been admitted. *See id.* at 516 (J. Douglas, dissenting) ("Congress did not secretly require two million noncitizens to be detained without bond, when nothing like this had ever been done before, and the whole history of American immigration law suggested it would not be. We would expect more than simple statutory silence if, and when, Congress were to intend a major departure.") (internal quotations, citation, and footnote omitted). As Judge Douglas noted, construing the statute to expect the detention of millions of aliens in detention facilities strained by merely 45,000 people is a proverbially large elephant stuffed in a very small mousehole, and not one Congress envisioned when it passed the IIRIRA. *Id.* at 514-17.

The recent enactment of the Laken Riley Act adds weight to this understanding of Congressional intent. The Act expressly required detention for noncitizens inadmissible under § 1182(a)(6)(A) – aliens present without being admitted or paroled – if they commit certain listed crimes. That specification in the Act would not have been necessary if Congress understood § 1225(b)(2) to require mandatory detention of all inadmissible aliens already present in the United States. *See, e.g.*, *Munoz Teran v. Bondi*, Case No. 2:25-cv-01218-KWR-SCY, 2026 WL 161527, at *4 (D.N.M. Jan. 21, 2026) (Riggs, J.) (explaining that respondents' interpretation would render superfluous Laken Riley Act); *Cortes v. Holt*, Case No. CIV-25-1176-SLP, 2025 WL 147435, at *1, 6 (W.D. Okla. Jan. 20, 2026) (concluding that enactment of Laken Riley Act lends further support for application of § 1226 to detention of aliens who entered without inspection or admission and resided in United States for years).

Significantly, immigration officers do not detain aliens under § 1225 pursuant to a warrant, whereas § 1226 expressly provides for the arrest and detention of an alien on a warrant. 8 U.S.C. § 1226(a). The regulations implementing § 1226 confirm that the Form I-200 is used for arrests pursuant to an immigration officer's authority under § 1226. *See* 8 C.F.R. § 236.1(b)(1) ("At the time of issuance of the notice to appear, or at any time thereafter and up to the time removal proceedings are completed, the respondent may be arrested and taken into custody under the authority of Form I–200, Warrant of Arrest."). Section 1226 also applies to aliens who are charged as inadmissible, including those who entered without inspection. *See* 8 U.S.C. § 1226(c)(1)(E) (explaining that Attorney General shall take into custody any alien who is inadmissible under paragraph (6)(A), (6)(C), or (7) of section 1182(a) and is charged with certain identified crimes). The overall structure of §§ 1225 and 1226 demonstrates that detention under § 1225 is done as part of the inspection process upon arrival at the border before an alien makes entry into the United States, and that after entry, § 1226 – with its warrant and bond hearing protections – applies to the apprehension and detention of inadmissible aliens within the interior of the country. *See Reyes-Martinez v. Woosley*, Civil Action No. 4:25-cv-150-RGJ, 2025 WL 3680330, at *7 (W.D. Ky. Dec. 18, 2025) (explaining that § 1225 detainees are detained upon arrival as a statutory function of the inspection process, not via an arrest pursuant to administrative warrant, which supports conclusion that § 1225 is for individuals seeking admission at the border who do not need to be arrested). After all, "government intrusions have always been tolerated at the border that would be intolerable in the interior, for the obvious reason that citizens and noncitizens alike expect to be able to go about their business without having to show that they are 'clearly and beyond doubt entitled to be admitted' if taken, or mistaken, for an otherwise inadmissible noncitizen." *Buenrostro-Mendez*, 166 F.4th at 519 (Douglas, J., dissenting).

The presiding judge in *Singh*, however, said that it would be "mistaken to read the provision as limited exclusively to physical border encounters." 2026 WL 146005, at *21. *Singh* held that an asylum applicant whose application is pending is nonetheless "seeking admission" and can be detained under § 1225(b)(2)(A). *See id.* at *35-36. *Singh* explained: "An alien may seek lawful entry at a port of entry, but an alien may also seek lawful admission from within the United States through statutory mechanisms such as an application for adjustment of status on Form I-485 or other congressionally authorized procedures for obtaining lawful admission." *Id.* at *21. *Singh* further reasoned that "seeking can also occur in the interior of the United States … when an alien who has not been admitted, an applicant for admission, makes some attempt to gain lawful admission, such as filing for an asylum or a visa." *Id.* at 35.

The Supreme Court, however, has clarified that lawful status and admission "are distinct concepts in immigration law." *Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021). An adjustment of status under § 1255 of the INA is a way for a nonimmigrant – a noncitizen lawfully present in the country on a designated, temporary basis – to obtain lawful permanent resident ("LPR") status generally so long as the nonimmigrant's presence is pursuant to a lawful admission. *See id.* at 411-12. In *Sanchez*, the noncitizen entered unlawfully, and after approximately 14 years, applied for Temporary Protected Status ("TPS"), entitling him to stay and work in the United States for as long as unsafe living conditions existed in his home country. *See id.* at 411-13. He applied for an adjustment to LPR status, which the USCIS denied because he had not been lawfully admitted to the United States. *Id.* at 413. The Supreme Court agreed because, although the TPS program gives foreign nationals nonimmigrant status, it does not admit them. *Id.* at 414. As relevant here, the Supreme Court explained:

> On the one hand, a foreign national can be admitted but not in lawful status—think of someone who legally entered the United States on a student visa, but stayed in

the country long past graduation. *On the other hand, a foreign national can be in lawful status but not admitted—think of someone who entered the country unlawfully, but then received asylum.* The latter is the situation Sanchez is in, except that he received a different kind of lawful status. The TPS statute permits him to remain in the country; and it deems him in nonimmigrant status for purposes of applying to become an LPR. But the statute does not constructively "admit" a TPS recipient—that is, "consider[ ]" him as having entered the country "after inspection and authorization." § 1254a(f)(4); § 1101(a)(13)(A). And because a grant of TPS does not come with a ticket of admission, it does not eliminate the disqualifying effect of an unlawful entry.

*Id.* at 415-16 (emphasis added).

Based on *Sanchez*, the Court concludes that the filing of an application for asylum is not "seeking admission"; rather, it is seeking a "lawful status." As the Tenth Circuit elaborated:

> "[A]dmitted" and "admission" are defined as "with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). This definition "is limited and does not encompass a post-entry adjustment of status," because it "refers expressly to *entry into* the United States, denoting by its plain terms passage into the country from abroad at a port of entry." *Negrete–Ramirez* [*v. Holder*], 741 F.3d [1047,] 1051 [(9th Cir. 2014)]; *see Papazoglou* [*v. Holder*], 725 F.3d [790,] 793 [(7th Cir. 2013)] ("That provision therefore encompasses the action of an entry into the United States, accompanied by an inspection or authorization."); *Bracamontes* [*v. Holder*], 675 F.3d [380,] 385 [(4th Cir. 2012)] ("Clearly, neither term includes an adjustment of status; instead, both contemplate a physical crossing of the border following the sanction and approval of United States authorities."); *Martinez* [*v. Mukasey*], 519 F.3d [532,] 544 [(5th Cir. 2008)] (recognizing that " 'admission' is the lawful *entry* of an alien after inspection, something quite different ... from post-entry adjustment of status"). Under the definition, Mr. Medina–Rosales was not "admitted" when he became an LPR after post-entry adjustment of status, because he did not enter the United States when he adjusted to that status.

*Medina-Rosales v. Holder*, 778 F.3d 1140, 1144-45 (10th Cir. 2015) (italics emphasis in original).

*See also Matter of V-X-, Respondent*, 26 I. & N. Dec. 147, 147 ("A grant of asylum is not an 'admission' to the United States under section 101(a)(13)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(13)(A) (2006)."). Requesting asylum is thus a request for an adjustment of status, not a request for admission. Because "seeking admission" requires actively requesting

admission, the filing of an application for asylum does not amount to "seeking admission" within the meaning of § 1225(b)(2)(A).

Petitioner entered the United States on February 16, 2023. He was processed at a port of entry at which time he was considered an "arriving alien" but he was released on his own recognizance. Petitioner then lived in the United States for well over two years. DHS detained him with a Form I-200 warrant on December 4, 2025, in the interior of the country.

The record, however, is inconsistent, contradictory, and ambiguous as to the basis for his release in February 2023. And the form of parole here matters to the determination of whether his detention should be governed by § 1226 or § 1225(b)(2)(A). *See Singh*, 2026 WL 146005, at * 17 ("The distinction between parole and conditional parole carries concrete statutory consequences."). This Court has held that detention for noncitizens generally detained in the interior of the country is pursuant to § 1226, which entitles the detainee to a bond hearing. *See, e.g.*, *Liu v. Bondi*, Civ. No. 26-143 JB/GJF, 2026 WL 878280, at *14 (D.N.M. Mar. 31, 2026) (Fouratt, J.). In those cases, however, there was no evidence that DHS released the noncitizen under § 1182(d)(5) parole.

By contrast, here, Petitioner asserts he was granted § 1182(d)(5) parole. *See* Petition ¶ 77, Dkt. No. 1; Supp. Br. 1, Dkt. No. 24. While the Secretary of Homeland Security has discretion to grant parole for urgent humanitarian reasons or significant public benefit, granting § 1182(d)(5)(a) parole "shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served *the alien shall forthwith return or be returned to the custody from which he was paroled* and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.* (emphasis added). "Accordingly, an alien detained under section 235(b)

who is released from detention pursuant to a grant of parole under section 212(d)(5)(A), and whose grant of parole is subsequently terminated, is returned to custody under section 235(b) pending the completion of removal proceedings." *Matter of Q. Li*, 29 I&N Dec. 66, 70 (BIA 2025). Once the grant of parole terminates, the noncitizen is required to return or be returned forthwith to the custody under § 1225 from which he was paroled. *Id.* Where Congress has permitted temporary parole but expressly stated that parole shall not be regarded as an admission of the alien, then a paroled alien is also regarded as stopped at the border and not having effected an entry. *See Leng May Ma*, 357 U.S. at 188-90. As the Supreme Court explained:

> The parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted. It was never intended to affect an alien's status, and to hold that petitioner's parole placed her legally 'within the United States' is inconsistent with the congressional mandate, the administrative concept of parole, and the decisions of this Court.

*Id.* at 190. Therefore, *if* the DHS Secretary granted Petitioner § 1182(d)(5)(A) discretionary parole and then properly revoked it, then by statute he is returned to the custody from which he was paroled.

Although Petitioner argues that he was granted humanitarian parole, Petitioner acknowledged in his brief and at the hearing that the paperwork is contradictory. *See* Mar. 9, 2026 Hr'g Liberty Recording, ABQ-Gila_20260309_134521, 2:47:58-2:51:48, 2:58:17-2:59:20; Resp. 10 n.1, Dkt. No. 15. While his I-94 lists the DT code for § 1182(d)(5)(A) parole, it did not list the reason for granting that parole, as is required. *See* Paroled (DT) – Port of Entry Guidance (updated Feb. 2020), Dkt. No. 24-4 at 2 ("The 'DT' and 'DE' codes were created to justify the reason for parole in specific cases. To ensure that reasons for a port parole are consistent across OFO, users are now prompted to select a reason from the available dropdown menu and annotate an approving supervisor.")). Moreover, the Form I-213 at no point states that he was released based on §

1182(d)(5)(A) parole or that his parole was revoked. Instead, it says his release on the Order of Recognizance was cancelled. *See* Gov.'s Ex. 1 at 2, Dkt. No. 11-1. While the Form I-213 said that he was previously "released on his own recognizance due to humanitarian reasons and a lack of detention space," the Form I-213 does not reference § 1182 parole at all. *See id.* at 2-3.

At the hearing, when asked whether Petitioner was granted § 1182(d)(5)(A) parole, counsel for Respondents stated that the agency believes he was *not* paroled per se, within the meaning of that term of art in the INA. *See* Mar. 9, 2026 Hr'g Liberty Recording, ABQ-Gila_20260309_134521, 3:52:18-3:54:23. Instead, he advised that Respondents' position is that Petitioner was granted discretionary parole and released on recognizance. *Id.* Based on the record, the Court finds that when DHS processed Petitioner on February 16, 2023, it allowed him to enter under a grant of conditional parole and did not parole him under § 1182(d)(5)(A). When DHS re-detained Petitioner on December 4, 2025, therefore, it did *not* do so after having revoked his parole under § 1182(d)(5)(A) – it never considered him paroled under § 1182(d)(5)(A) in the first place.

Consequently, at the time DHS detained him on December 4, 2025, Petitioner was not "seeking admission" into the United States, as he had already entered the United States years prior under a conditional grant of parole. Nor was he returned to the custody from which he was paroled under § 1182(d)(5)(A), because he was never properly paroled thereunder and his parole was therefore never properly revoked under that statute. The Court therefore finds that he is detained under § 1226 and is entitled to a bond hearing, the denial of which violates the INA. Moreover, even assuming that Petitioner is only entitled to the process afforded by Congress, Congress authorized noncitizens in his situation a bond hearing under § 1226. Consequently, Respondents' detention of Petitioner for more than four months without the requisite bond hearing violates both

his statutory rights and his procedural due process rights. The Court therefore recommends granting the Petition on Counts One and Two.

### 4. Petition should be denied as to Counts Three and Four.

In Count Three, Petitioner asserts that Respondents violated the INA by revoking his parole without an individualized assessment in his case. Petition ¶ 103, Dkt. No. 1. He further asserts in Count Four that they violated the APA by deciding to revoke his parole without consideration of his individual facts and circumstances. *See id.* ¶¶ 111-13. This Court recommends finding that Petitioner was never granted § 1182(d)(5)(A) parole and that DHS never treated him as being paroled under § 1182(d)(5)(A). Counts Three and Four presume revocation of parole under § 1182(d)(5)(A). Because the Court finds that Respondents never granted or revoked parole under § 1182(d)(5)(A), the Petition should be denied as to Counts Three and Four.

### 5. A prompt bond hearing in accordance with § 1226(a) is the appropriate remedy for violation of the INA.

Petitioner requests release from ICE custody or a prompt bond hearing at which the government bears the burden of justifying his continued detention. Petition 24, Dkt. No. 1. Respondents assert that, should the Court conclude § 1226 applies, it should decline to grant immediate release, which circumvents § 1226(e)'s limitation on judicial review of a decision to deny bond. Resp. 22, Dkt. No. 11.[7] In reply, Petitioner asserts that "the only available relief from his illegal and unconstitutional confinement is his immediate release." Resp. 17, Dkt. No. 15.

The Court recommends that the appropriate remedy for the § 1226 violation is a prompt bond hearing before an immigration judge, not immediate release. *See*, *e.g.*, *Castillo v. De Anda Ybarra*, No. CIV 25-1074 JB/JFR, 2026 WL 370497, at *36 (D.N.M. Feb. 10, 2026) (Browning,

---

[7] Section 1226(e) provides: "The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention of any alien or the revocation or denial of bond or parole." 8 U.S.C. § 1226(e).

J.) (explaining that, because noncitizen was not seeking admission, United States could not detain him under § 1225(b)(2), so it must detain him under § 1226(a) and afford him procedural protections the statute provides). As for the timing of the bond hearing, the Court recommends that the bond hearing be held within seven days. If Respondents are unable or decline to follow § 1226's statutory requirements, the Court recommends they release him immediately. *Id.*

For the initial custody determination by the arresting immigration officer, governing regulations place the burden on the alien to "demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." 8 C.F.R. § 236.1(c)(8). The BIA applied the same presumption in bond hearings before immigration judges. *See Castillo*, 2026 WL 370497, at *42 (quoting *In Re Adeniji*, 22 I. & N. Dec. 1102, 1113 (BIA 1999)). Some courts have shifted the burden to the government at the bond hearing to show by clear and convincing evidence that the petitioner is either a danger to the community or a flight risk. *See, e.g.*, *Pu Sacvin v. De Anda-Ybarra*, No. 2:25-cv-1031 KG/JFR, 2025 WL 3187432, at *3 (D.N.M. Nov. 14, 2025) (citing *Salazar v. Dedos*, 2025 WL 2676729, at *6 (D.N.M.)). The presiding judge, however, has concluded that a remedy that changes the burden at a bond hearing is outside the scope of the writ of habeas corpus "unless the bond hearing's existing structure is so weighed against the alien that the alien has no chance to be released on bond." *Castillo*, 2026 WL 370497, at *42. Because a § 1226(a) bond hearing requires only that the alien prove that he is not a flight risk or danger to the community, the current structure does not deny an alien a meaningful chance at success at achieving release. *Id.* The Court thus recommends that the presiding judge deny Petitioner's request that the Respondents carry the burden at the bond hearing and instead order that the bond hearing comply with § 1226 and its implementing regulations. *See id.*

**6. Request for an order enjoining transfer should be granted but request to enjoin deportation should be denied.**

Petitioner requests an order that he not be transferred outside the District of New Mexico or deported while his Petition is pending. Petition 24, ¶ 5, Dkt. No. 1. Respondents argue that this Court lacks jurisdiction to grant his request, and even if it does, it should decline to enjoin transfer. According to Respondents, this Court retains jurisdiction of the case, regardless of Petitioner's location. Resp. 20, Dkt. No. 11.

Under the All Writs Act, courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). As discussed *supra*, this Court has jurisdiction to consider the claims in this habeas case. The Court is not convinced that it would necessarily lose jurisdiction of the habeas case even if Petitioner were transferred out of New Mexico. *Cf. Ex parte Endo*, 323 U.S. 283, 304-06 (1944) (holding that district court acquired jurisdiction of habeas case filed in district where petitioner was then located, and that court did not lose jurisdiction when the petitioner was transferred to another state where a person in whose custody the petitioner is remains within district); *Pinson v. Berkebile*, 604 F. App'x 649, 652–53 (10th Cir. Mar. 10, 2015) (holding that "the District of Colorado acquired jurisdiction when [the petitioner] filed his habeas petition" while he was held in Colorado, and that his transfer to another state "does not defeat that initial jurisdiction") (citing *Rumsfeld v. Padilla*, 542 U.S. 426, 440–41 (2004)).

As for specific jurisdiction to enjoin transfer, Respondents cite *Edison v. Decker*, Civil Action No. 20-15455 (SRC), 2021 WL 1997386 (D.N.J. May 19, 2021), an out-of-circuit, non-precedential case that did not ultimately decide the jurisdictional issue, *id.* at *6. *Edison*, in turn, relied in part on *Calla-Collado v. Attorney General of U.S.*, in which the Third Circuit concluded that a detainee's right to present evidence at deportation proceedings was not violated by his

transfer to another state's detention facility. 663 F.3d 680, 685 (2011). As part of the ruling, the Third Circuit stated that ICE has the authority to determine the location of detention of an alien in deportation proceedings and to transfer aliens from one detention center to another. *Id.* The case, however, did not address jurisdiction. Respondents have not convinced the Court that it lacks jurisdiction to enjoin a transfer to an out-of-state detention facility if doing so aids the Court's resolution of this habeas Petition.

Consequently, the Court recommends the presiding judge grant the request to enjoin Petitioner's transfer outside the District of New Mexico until this habeas petition is decided or until Petitioner receives a final order of removal, whichever comes first, but deny the request to enjoin his deportation. As the presiding judge explained when resolving similar requests:

> [T]he Court exercises its discretion under the All Writs Act only to enjoin Petitioners' unlawful removal from New Mexico while their habeas proceedings remain pending. The Court does not prevent, however, the United States from proceeding with the Petitioners' removal proceedings under § 1229(a) during the pendency of these habeas proceedings. The Court will not use the All Writs Act to prevent the United States from using statutory proceedings to obtain a lawful order of removal. Once the Petitioners receive a final order of removal, the United States ceases to detain the Petitioners or put them on bond under § 1226(a), but instead they transfer to § 1231's statutory authority. At that time, the Court loses jurisdiction to hear the habeas petitions for release under § 1226(a), because the habeas petitions will be moot, and, therefore, at that time the All Writs Act is no longer necessary to prevent the Court from losing jurisdiction which it no longer has. The All Writs Act, therefore, is incapable of preventing the United States from carrying out a lawful order of removal on the basis of protecting the Court's jurisdiction, because the Court will lose jurisdiction for this habeas proceeding once the United States obtains a lawful final order of removal.

*Castillo*, 2026 WL 370497, at *44.

### 7. Request to enjoin re-detention unless ordered at custody hearing before neutral arbiter should be denied.

Petitioner seeks an order enjoining his re-detention unless ordered at a custody hearing before a neutral arbiter in which the government bears the burden of proving by clear and

convincing evidence that he is a flight risk or danger to the community. Petition 25, ¶ 6, Dkt. No. 1. Respondents counter that the request is without support and overbroad, noting it would require burden shifting even were Petitioner to commit a serious crime. The Court agrees and recommends denying the relief requested as overbroad, unripe, and beyond the scope of what is needed to remedy the specific harm as alleged in the habeas Petition.

### 8. Request for an award of EAJA fees is premature.

Petitioner seeks an award of reasonable attorney's fees and costs under EAJA, 5 U.S.C. § 504, and 28 U.S.C. § 2412. Petition 25, ¶ 8, Dkt. No. 1. Respondents assert that the request is not ripe until Petitioner files an application and shows that Respondents' position was not substantially justified. Resp. 20, Dkt. No. 11. "The Equal Access to Justice Act (EAJA) directs a court to award 'fees and other expenses' to private parties who prevail in litigation against the United States if, among other conditions, the position of the United States was not 'substantially justified.'" *Commissioner, I.N.S. v. Jean*, 496 U.S. 154, 155 (1990) (quoting 28 U.S.C. § 2412(d)(1)(A)). Under the EAJA, "a fee award is required if: (1) plaintiff is a 'prevailing party'; (2) the position of the United States was not 'substantially justified'; and (3) there are no special circumstances that make an award of fees unjust." *Hackett v. Barnhart*, 475 F.3d 1166, 1172 (10th Cir. 2007). The Court finds this request premature unless and until the presiding judge grants relief on the Petition. Should the Court rule in Petitioner's favor on any of the substantive causes of action, the Court recommends Petitioner be afforded 30 days after entry of final judgment to submit a motion for attorney's fees and expenses, with an affidavit attached justifying requested fees and costs.

### 9. The Preliminary Injunction Motion should be denied as moot

Petitioner filed a separate motion for a temporary restraining order and preliminary injunction. *See* Preliminary Injunction Mot. 1, Dkt. No. 3. He requests an order (1) requiring

Respondents to release him immediately from custody and not re-detain him unless ordered at a custody hearing before a neutral arbiter in which the Government proves by clear and convincing evidence that Petitioner is a flight risk or danger to the community, or (2) requiring Respondents to release him unless he is afforded a bond hearing before a neutral arbiter under 8 U.S.C. § 1226(a) within seven days of the order. *Id.* at 3. The Court consolidated the decision on the motion with the Petition, so the relief requested in the motion duplicates the relief requested in the Petition. Given the Court's recommendations set forth herein on the merits and on the requested remedies in the Petition, the Court recommends that the Preliminary Injunction Motion be denied as moot.

## VI.     CONCLUSION

For the reasons stated above, the Court **RECOMMENDS** that:

1. The *Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241* (**Dkt. No. 1**) should be **GRANTED IN PART** and **DENIED IN PART** as follows:

    a. The Petition should be **GRANTED** on Counts One and Two.

    b. The Petition should be **DENIED** as to Counts Three and Four.

    c. The following forms of relief requested in the Petition should be **GRANTED**:

        i. Assume jurisdiction over the matter;

        ii. Issue a writ of habeas corpus ordering an individualized bond hearing before an immigration judge be held within seven days;

        iii. Declare that Petitioner's detention for over four months without a bond hearing violates the INA and his procedural due process rights under the Due Process Clause of the Fifth Amendment;

iv. Enter an order enjoining Petitioner's transfer outside this judicial district until this habeas petition is decided or a final order of removal is filed, whichever comes first.

d. The following forms of relief requested in the Petition should be **DENIED**:

i. The request to issue a show cause order within three days and a hearing within five days should be denied as moot;

ii. The request to order his immediate release;

iii. The request to require the Government to bear the burden justifying his continued detention;

iv. The requests to declare that his *arrest* violates the Due Process Clause, the Fourth Amendment, the APA, and the INA and to declare that his detention violates the Fourth Amendment and the APA are unnecessary to resolve the Petition and should be denied as moot;

v. The request to enjoin his deportation;

vi. The request to enjoin Respondents from re-detaining Petitioner unless his re-detention is ordered at a custody hearing before a neutral arbiter in which the government bears the burden of providing by clear and convincing evidence that Petitioner is a flight risk or danger to the community; and

vii. The request to "[s]et aside Respondents' unlawful practice pursuant to 5 U.S.C. § 706(2)."

2. Petitioner's *Notice of Motion and Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction; Memorandum of Points and Authorities* (Dkt.

No. 3) should be **DENIED as moot**, given the relief recommended on the merits of the Petition.

3. The Federal Respondents' *Motion to Dismiss Petition for a Writ of Habeas Corpus* (**Dkt. No. 11**) should be **GRANTED IN PART AND DENIED IN PART** as follows:

    a. The Federal Respondents' request to dismiss Counts Three and Four should be **GRANTED**.

    b. The Federal Respondents' request to dismiss Counts One and Two should be **DENIED**.

**SO RECOMMENDED.**

---

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

---

    **THE HONORABLE GREGORY J. FOURATT**
    **UNITED STATES MAGISTRATE JUDGE**